# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

REGINALD L. HOLLIMON,

    *Petitioner*,

vs.

BRIAN WILLIAMS, *et al.,*

    *Respondents*.

2:15-cv-02243-GMN-VCF

ORDER

    This habeas matter under 28 U.S.C. § 2254 by a Nevada state inmate comes before the Court for a final decision on the merits.

### *Background*

    Petitioner Reginald Hollimon challenges his 2013 Nevada state conviction, pursuant to a jury verdict, of robbery and his adjudication as a habitual criminal under the "small" Nevada habitual criminal statute. He was sentenced to 96 to 240 months. Hollimon challenged the conviction in the state courts on direct appeal and post-conviction review.

    Petitioner challenges, *inter alia*, the sufficiency of the evidence supporting his conviction for robbery. He was charged essentially with a purse snatching in a grocery store parking lot. The evidence presented at trial included, *inter alia*, the following.[1]

---

[1]The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The Court summarizes same solely as background to the issues presented in this case, and it does not summarize all such material. No statement of fact made in describing statements, testimony or other evidence in the state court constitutes a finding by this Court. Any
(continued...)

1  Store security guard Kenneth Hodge testified as follows.

2  Hodge came on duty at the Von's Grocery Store at Maryland Parkway and Twain at
3  10:00 p.m. on November 23, 2011. Shortly after coming on duty, Hodge watched an
4  individual who he identified at trial as Reginald Hollimon approach the cashier for the slot
5  machines area a first time and thereafter a second time. Hollimon was wearing a multicolored
6  shirt during that time. (ECF No. 11-2, at 24-25 & 30-36; Exhibit 27, at 23-24 & 29-35.)[2]

7  About thirty minutes later, both Hodge and Hollimon happened to be exiting the store
8  at the same time. Hodge went out to his car to eat his lunch, as he had not eaten before
9  reporting to work. As he sat in his car eating, he watched Hollimon go kneel down behind a
10  utility box and then move out from behind the box and again kneel by it. Hollimon then
11  removed the multicolored shirt, leaving him wearing all black, including a black long-sleeved
12  shirt. Hollimon then began walking back in the general direction of the store entrance. Hodge
13  exited his vehicle to intercept Hollimon, but his view of Hollimon was briefly obstructed by a
14  vehicle while he did so. (ECF No. 11-2, at 36-43; Exhibit 27, at 35-42.)

15  Meanwhile, Jolene Thomas had been grocery shopping at Vons with her sister Dovie
16  Henderson, her then ten-year-old daughter Onyx, and her then thirteen-year-old daughter
17  Sapphire. (ECF No. 11–2, at 75-79; Exhibit 27, at 74-78.)

18  According to Jolene Thomas' testimony, at the time of the incident, the four of them
19  had exited the Vons and were nearly finished unloading the shopping cart into the trunk of
20  their vehicle. Dovie was at the driver's side getting ready to get in the vehicle, and Sapphire
21  was at the passenger side waiting for Dovie to unlock the doors so that she also could get in.
22  The shopping cart was up against the rear bumper of the vehicle with the rear handle area

23

---

24  [1](...continued)
25  absence of mention of a specific piece of evidence or category of evidence in this overview does not signify that the Court has overlooked the evidence in considering petitioner's claims.

26  [2]Hodge initially referred to the store as being at Maryland Parkway and Karen, but the store in
27  question is at Maryland Parkway and Twain, immediately east of Molasky Park. (See ECF No. 11-2, at 178-79; Exhibit 27, at 177-78.) In addition to the cited record evidence, the Court takes judicial notice that there is
28  no Vons at Maryland Parkway and Karen and that there was no Vons, or neighboring Molasky park, at that location in November 2011.

1 facing back toward the store. Thomas was at the rear handle area of the cart bending over
2 the last grocery items, with her daughter Onyx standing to the side of the cart facing her.
3 Thomas' large black purse was sitting in the raised section of the shopping cart. (ECF No.
4 11-2, at 77- 80 & 84; Exhibit 27, at 76-79 & 83.)

5 According to Thomas' testimony, as she was rising back up from leaning over the
6 groceries, a man reached between Thomas and her daughter Onyx, grabbed Thomas' purse
7 and pulled it out between Thomas and Onyx. The man then slammed into Onyx, knocking
8 her back into the shopping cart and down to the ground, before running away with Thomas'
9 purse. Thomas testified that there had been enough room between her and Onyx for the man
10 to reach in and grab her purse without making contact with either one. She testified, however,
11 that, after grabbing the purse, the approximately 6'2" to 6'3" man lowered his shoulder and
12 took a step into Onyx and hit her in her chest and shoulder area. (ECF No. 11-2, at 84-88 &
13 100; Exhibit 27, at 83-87 & 99.)

14 Thomas testified that the man's action in knocking Onyx into the cart and to the ground
15 appeared to her to be deliberate. Onyx was slightly over 5'1" tall; and, with some health
16 issues, she weighed 270 pounds at the time. Thomas testified that Onyx typically could not
17 be knocked down easily if they were playing or wrestling. The man made no effort to help her
18 up or apologize. Onyx' back was bruised by the initial impact with the shopping cart; and she
19 also had pain in her knee, elbow and shoulder afterwards. (ECF No. 11-2, at 86-91 & 103;
20 Exhibit 27, at 85-90 & 102.)

21 Thomas positively identified Hollimon at trial as the man who grabbed her purse and
22 knocked her daughter to the ground. (ECF No. 11-2, at 85-86; Exhibit 27, at 84-85.)

23 When Kenneth Hodge was able to see where Hollimon was again, he saw Onyx
24 Thomas falling to the ground and Hollimon then turning and fleeing with a purse, while a
25 woman was screaming. (ECF No. 11-2, at 43-44; Exhibit 27, at 42-43.)

26 Both Hodge and Jolene Thomas initially gave chase as Hollimon ran west toward the
27 neighboring Molasky Park. Thomas stopped at the edge of the park, however, after the
28 security guard Hodge passed her up. (ECF No. 11-2, at 45 & 85; Exhibit 27, at 44 & 84.)

1    As he ran, Hollimon shed the black long-sleeved sweatshirt that he was wearing.

2 Thomas went and retrieved it from inside the park, thinking at first that he had dropped her

3 black purse.  (ECF No. 11-2, at 45 & 91-94; Exhibit 27, at 44 & 90-93.)

4    Hodge meanwhile continued chasing Hollimon, repeatedly calling after him for Hollimon

5 to drop the purse.  Hodge followed Hollimon into the grounds of Shelter Island Apartments

6 immediately west of Molasky Park.  At one point, Hollimon tripped and fell; and Hodge caught

7 up to him.  Hollimon pushed Hodge away forcefully, however, and began running again.

8 Hodge thereafter lost sight of Hollimon for approximately three seconds after Hollimon

9 rounded the corner of a building.  Hodge found him immediately thereafter, however, hiding

10 against a wall.  When Hodge again asked for the purse, Hollimon emptied the contents of the

11 purse into a dumpster before tendering the purse to Hodge.  The security guard took the

12 apparently winded and shirtless Hollimon by the arm and started walking him, against

13 resistance, back toward the grocery store.  The Las Vegas Metropolitan Police ("Metro")

14 arrived shortly after this point, however, and took Hollimon into police custody.  (ECF No. 11-

15 2, at 45-58; Exhibit 27, at 44-57.)

16    Jolene Thomas identified Hollimon as the man who stole her purse and knocked her

17 daughter to the ground in a showup at the Shelter Island Apartments a short time later.  She

18 was "absolute[ly]" certain and "positive" in her identification of Hollimon as the perpetrator.

19 She further identified her purse and the contents of her purse that were found in the

20 dumpster.  (ECF No. 11-2, at 94-99; Exhibit 27, at 93-98.)[3]

21    Any further factual particulars pertinent to individual claims are discussed further, *infra*,

22 in the discussion of those claims.

---

24    [3]Thomas' two daughters and her sister each gave testimony that was substantially consistent with
Thomas' testimony as to the portions of the events that they each respectively observed.  (See ECF No. 11-2,

25 at 106-76; Exhibit 27, at 105-75.)  The sister, Dovie Henderson, additionally testified, *inter alia*, that she saw
Hollimon inside the store prior to the incident closely eyeing the family members in a suspicious manner.  (*Id.*,

26 at 149-52; Exhibit 27, at 148-51.)  Henderson also positively identified Hollimon as the man who grabbed her
sister's purse, in a separate showup from the one conducted for her sister.  She testified that she was "[a]

27 hundred percent" sure as to her identification of Hollimon.  (*Id*, at 169-72; Exhibit 27, at 168-71.)  Police
officers additionally testified as to the initial investigation and further as to statements made by Hollimon.

28 (See *id.*, at 177-199; Exhibit 27, at 176-198.)

### *Standard of Review*

2      The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly

3  deferential" standard for evaluating state-court rulings on the merits that is "difficult to meet"

4  and "which demands that state-court decisions be given the benefit of the doubt." *Cullen v.*

5  *Pinholster*, 563 U.S. 170 (2011). Under this highly deferential standard of review, a federal

6  court may not grant habeas relief merely because it might conclude that the state court

7  decision was incorrect. 563 U.S. at 202. Instead, under 28 U.S.C. § 2254(d), the court may

8  grant relief only if the state court decision: (1) was either contrary to or involved an

9  unreasonable application of clearly established federal law as determined by the United

10  States Supreme Court; or (2) was based on an unreasonable determination of the facts in

11  light of the evidence presented at the state court proceeding. 563 U.S. at 181-88.

12      A state court decision is "contrary to" law clearly established by the Supreme Court

13  only if it applies a rule that contradicts the governing law set forth in Supreme Court case law

14  or if the decision confronts a set of facts that are materially indistinguishable from a Supreme

15  Court decision and nevertheless arrives at a different result. *E.g., Mitchell v. Esparza*, 540

16  U.S. 12, 15-16 (2003). A state court decision is not contrary to established federal law merely

17  because it does not cite the Supreme Court's opinions. *Id.* Indeed, the Supreme Court has

18  held that a state court need not even be aware of its precedents, so long as neither the

19  reasoning nor the result of its decision contradicts them. *Id.* Moreover, "[a] federal court may

20  not overrule a state court for simply holding a view different from its own, when the precedent

21  from [the Supreme] Court is, at best, ambiguous." 540 U.S. at 16. For, at bottom, a decision

22  that does not conflict with the reasoning or holdings of Supreme Court precedent is not

23  contrary to clearly established federal law.

24      A state court decision constitutes an "unreasonable application" of clearly established

25  federal law only if it is demonstrated that the state court's application of Supreme Court

26  precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g.,*

27  *Mitchell*, 540 U.S. at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

28      / / / /

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of Section 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> . . . . [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Pinholster*, 563 U.S. at 569.

### *Discussion*

### *Ground 1(a): Effective Assistance of Counsel – Alleged Concession of Guilt*

In Ground 1(a), petitioner alleges that he was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments because trial counsel conceded at the preliminary hearing that the evidence was sufficient to charge him with robbery. (ECF No. 6, at 11-12.)

Hollimon was charged initially by a criminal complaint with one count of possession or sale of personal identifying information and one count of possession of a credit or debit card without the cardholder's consent, based upon his possession of Jolene Thomas' driver's license and a MasterCard. (ECF No. 10-3; Exhibit 3.)

At the preliminary hearing, Jolene Thomas and Kenneth Hodge testified substantially as they later did at trial, as summarized previously herein, albeit with less exploration of some details. (See ECF No. 10-4, at 2-14; Exhibit 4, at 4-49.)

Following the preliminary hearing testimony, the State sought to make a number of amendments, including adding: (a) "a third count, battery with intent to commit a crime, being larceny and/or robbery, larceny from the person and/or robbery, specifically that the defendant in an attempt to commit this crime pushed Onyx Thomas our of the way in order to take the purse and complete the theft;" and (b) "a fourth count, robbery, specifically that in the process of completing the robbery the defendant pushed Kenneth Hodge out of the way and continued to run away in order to complete his robbery and to retain possession of Jolene Thomas' purse and the contents thereof." (ECF No. 10-4, at 14; Exhibit 4, at 50-51.)

Defense counsel objected to the battery with intent count while acknowledging that "I believe that the robbery has the force element in it, and pushing Onyx to grab the purse seems like it would be something that they could charge as a count of robbery, and so they wouldn't need to have the battery with intent to commit robbery." After the State modified its amendment to robbery on the third count, counsel stated that "[t]hen that just stops my argument and I had nothing for Count 4." She thereafter presented argument directed to the original two counts, to which the justice court gave extensive consideration. However, the court ultimately bound all four counts over to the district court. (Ecf No. 10-4, at 14-17; Exhibit 4, at 51-62.)

The State ultimately charged Hollimon in an amended information at the time of trial with only the two counts of robbery based upon use of force respectively against Onyx Thomas and Kenneth Hodge. The jury convicted only on the first robbery count based upon use of force against Onyx Thomas. (ECF No. 10-24; Exhibit 24. ECF No. 11-7; Exhibit 32.)

The state appellate courts rejected the corresponding ineffective-assistance claim presented on state post-conviction review on the following basis:

> First, appellant claimed that his trial counsel was ineffective during the preliminary hearing for conceding that he committed robbery. Appellant failed to demonstrate that his trial counsel's performance was deficient or that he was prejudiced. Counsel did not concede during the preliminary hearing that appellant had committed robbery. The discussion appellant highlights occurred because counsel had objected to the State's attempt to add an additional charge of battery. Counsel merely asserted that an additional battery charge would not be

> appropriate based upon the evidence presented at the preliminary hearing regarding the robbery charge. Because the State presented sufficient evidence at the preliminary hearing to support a probable cause finding for robbery, *see Sheriff, Washoe Cnty. v. Hodes*, 96 Nev. 184, 186, 606 P.2d 178, 180 (1980), appellant failed to demonstrate a reasonable probability of a different outcome had counsel made different arguments at the preliminary hearing. Therefore, the district court did not err in denying this claim.

(ECF No. 12-32, at 3; Exhibit 82, at 2.)

The state appellate courts' rejection of this claim was neither contrary to nor an objectively unreasonable application of clearly established federal law as determined by the United States Supreme Court.

On petitioner's claims of ineffective assistance of counsel, he must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984). He must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's deficient performance caused actual prejudice. On the performance prong, the issue is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from her perspective at the time. The court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct. On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *E.g., Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

The state appellate courts' conclusion that petitioner could not demonstrate resulting prejudice was not an objectively unreasonable application of the general standard in *Strickland*. There clearly was sufficient evidence to bind a robbery count over for trial. Nothing more than speculation supports an inference that the State would have charged the case any differently than it ultimately did at trial if defense counsel had argued differently at the preliminary hearing. By the time of trial, the State dropped all other possible charges from the case and proceeded only on a very simple, direct and common-sense information charging Hollimon with only two counts of robbery based upon the use of force respectively against Onyx Thomas and Kenneth Hodge. It again is pure speculation that Hollimon

-8-

1   ultimately would have been charged any differently than he ultimately was if counsel had

2   argued differently at the preliminary hearing.

3       Petitioner urges that counsel conceded at the preliminary hearing that he was guilty

4   of robbery and that his presumption of innocence was compromised. Nothing in counsel's

5   preliminary hearing argument did – or could – concede guilt at trial, which she vigorously

6   contested. The argument at the preliminary hearing was directed only to the question of

7   whether there was probable cause to charge petitioner, not whether he in fact was guilty of

8   any offense.

9       The state appellate courts' rejection of this claim accordingly was neither contrary to

10  nor an unreasonable application of *Strickland*.

11      Ground 1(a) therefore does not provide a basis for federal habeas relief.

12      ***Ground 1(b): Effective Assistance – Impeachment by Police Officer Testimony***

13      In Ground 1(b), petitioner alleges that he was denied effective assistance of counsel

14  because trial counsel did not call two police officers as witnesses "who would have impeached

15  the victims regarding their prior statements and challenged their version of the events."

16  Petitioner suggests that "at a trial the defense has to call somebody on the petitioner's behalf"

17  and that "the risk that some how the police officers would have corroborated the witness['] trial

18  testimony is a risk counsel had to take." (ECF No. 6, at 12-13.)

19      At trial, defense counsel cross-examined multiple percipient witnesses extensively as

20  to alleged inconsistencies and/or omissions in their prior statements and/or preliminary

21  hearing testimony. (See ECF No. 11-2, at 59-64, 68-70, 99-101, 104-06, 124-27 & 173-74;

22  Exhibit 27, at 58-63, 67-69, 98-100, 103-05, 123-26 & 172-73.)

23      The state appellate courts rejected the claim presented on state post-conviction review

24  on the following basis:

25

26          Second, appellant claimed that his trial counsel was
            ineffective for failing to question the arresting police officers
27          regarding the victims' prior inconsistent statements regarding the
            incident. Appellant failed to demonstrate that his trial counsel's
28          performance was deficient or that he was prejudiced. Counsel
            cross-examined the victims regarding their previous statements

-9-

and challenged their version of events. Appellant failed to demonstrate a reasonable probability of a different outcome had counsel sought to introduce the victims' prior statements through the arresting officers' testimony. Therefore, the district court did not err in denying this claim.

(ECF No. 12-32, at 3-4; Exhibit 82, at 2-3.)

The state appellate courts' rejection of this claim was neither contrary to nor an objectively unreasonable application of, *inter alia*, the general performance standard in *Strickland*.

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). On the performance prong in particular, "[e]ven under a *de novo* review, the standard for judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105. Accordingly,

. . . *Strickland* specifically commands that a court "must indulge [the] strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment." 466 U.S., at 689–690, 104 S.Ct. 2052. The [reviewing court is] required not simply to "give [the] attorneys the benefit of the doubt," . . . but to affirmatively entertain the range of possible "reasons [defense] counsel may have had for proceeding as they did," . . . (Kozinski, C.J., dissenting). *See also Richter, supra*, at 1427, 131 S.Ct., at 791 ("*Strickland* ... calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind").

*Pinholster*, 563 U.S. at 196. *See also Richter*, 562 U.S. at 109-10.

When the deferential review of counsel's representation under *Strickland* is coupled with the deferential standard of review of a state court decision under AEDPA, *Richter* instructs that such review is "doubly" deferential:

. . . . The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. . . . . When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Richter*, 562 U.S. at 105.

In the present case, there certainly is a reasonable argument that counsel satisfied *Strickland's* deferential standard when she declined to call two additional police officers to

-10-

attempt to impeach the State's percipient witnesses. Counsel had inquired into multiple alleged inconsistencies and/or omissions in their prior statements and/or preliminary hearing testimony. The witnesses acknowledged during cross-examination the prior statements and the failure to include sundry details in their prior statements. Even assuming *arguendo* that the trial court would have allowed extrinsic evidence of the statements thereafter, a decision to not seek to put police officers on to testify about the statements was not an objectively unreasonable trial strategy. Counsel made the points that she needed to make on cross, and opting to not call additional witnesses to make the same points was not an unreasonable strategic decision. Petitioner did not identify any further specifics that either were not inquired into on cross or that could not have been inquired into on cross rather than relying upon police officer testimony. Such a strategic choice as to how to best make the points desired by the defense is "virtually unchallengeable" under *Strickland*. 466 U.S. at 690.

Petitioner posits that trial counsel "had" to call a witness, ostensibly, in his behalf and further that counsel "had" to take the risk that the police officers might also provide testimony unfavorable to the defense. *Strickland*, however, imposes no such requirements. *See* 466 U.S. at 688-89 ("No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant."). Experienced litigators know – or soon learn – that every additional witness called has the potential of doing more harm than good. It accordingly is an established criminal defense strategy to seek to establish the desired defense points during cross-examination of the State's witnesses without necessarily calling witnesses in the defense case-in-chief. Nothing in *Strickland* requires a criminal defense attorney to call witnesses simply for the sake of doing so, much less to call potentially adverse witnesses such as police officers to establish points already delved into in cross-examination of other witnesses.

The state appellate courts' rejection of this claim therefore was neither contrary to nor an objectively unreasonable application of *Strickland*.

Ground 1(b) does not provide a basis for federal habeas relief.

***Ground 1(c): Effective Assistance – Voluntary Intoxication***

In Ground 1(c), petitioner alleges that he was denied effective assistance because trial counsel "failed to argue voluntary intoxication not as a defense for taking the purse but in an effort to develop and argue 'any defense.'" He urges that "he went to trial with no defense [which is] a recognized demonstration of both deficiency and prejudice." (ECF No. 6, at 13.)

The state appellate courts rejected the claim on the following basis:

> Third, appellant claimed that his trial counsel was ineffective for failing to present a defense of voluntary intoxication. Appellant failed to demonstrate either deficiency or prejudice for this claim. Robbery is a general intent crime, and therefore, appellant would not have been shielded from liability for robbery due to an assertion of voluntary intoxication. *See Daniels v. State*[,] 114 Nev. 261, 269, 956 P.2d 111, 116 (1998). Therefore, the district court did not err in denying this claim.

(ECF No. 12-32, at 4; Exhibit 82, at 3.)

The state courts' rejection of this claim was neither contrary to nor an objectively unreasonable application of *Strickland*. Just as *Strickland* does not require criminal defense attorneys to call witnesses simply for the sake of calling witnesses, it does not require counsel to raise a defense for the sake of raising "any defense," particularly a baseless and irrelevant defense. Defense counsel indisputably challenged the State's case at trial, both in cross-examination and closing argument, securing a jury acquittal on one of the two counts. (E.g., ECF No. 11-3, at 36-47; Exhibit 28, at 35-46. ECF No. 11-7; Exhibit 32.)

Ground 1(c) clearly does not provide a basis for federal habeas relief.

***Ground 1(d): Effective Assistance – Alleged Conflict of Interest***

In Ground 1(d), petitioner alleges that he was denied effective assistance of counsel because the public defender allegedly had represented "a State's witness" in "an unrelated criminal matter." (ECF No. 6, at 13.)[4]

---

[4]The remaining allegations in Ground 1(d) are contained in his otherwise identical petition in No. 2:15-cv-02075-JCM-VCF. The Clerk was instructed to copy that petition into the record in this matter. (ECF No. 5.) However, apparently the petition in this matter still is missing three pages that are present in the petition in the prior action. In the petition, as properly reconstructed, the remaining allegations in Ground 1(d)
(continued...)

Hollimon's state petition alleged that the public defender had represented the victim's sister, Dovie Henderson, in 2003 on a charge of possession of a drug not introduced into commerce and unlawful possession of drug paraphernalia and in 2006 on a charge of possession of a drug not introduced into commerce. (ECF No. 12-11, at 33 & 45-50; Exhibit 61, at 32 & Exhibit "B" thereto.)   Henderson was an eyewitness at petitioner's trial in November 2012. (See text, *supra*, at n.3.)

The state district court rejected the claim on the following grounds:

> Defendant did not receive ineffective assistance of counsel due to an alleged conflict of interest.  Defendant's claim that counsel had  a conflict of interest because the Public Defender's Office had represented one of the witnesses in this case in unrelated criminal proceedings in 2003 and 2006 is without merit. Defendant cannot demonstrate that any actual conflict of interest existed, much less an actual conflict that affected the adequacy of counsel's performance.  The witness' 2003 and 2006 misdemeanor cases were completely unrelated to Defendant's 2011 case. Additionally, Defendant's attorney was not counsel for  the  witness  in either of those cases which have long since been resolved.  Counsel had no responsibility to the witness and there was no risk  that representation of Defendant would be materially limited thereby.   Therefore, Defendant's claim is denied.

(ECF No. 12-24, at 5; Exhibit 74, at 4.)

The state appellate courts in turn held as follows on the claim:

> Fourth, appellant claimed that his trial counsel acted under a conflict of interest. Appellant asserted that the Clark County Public Defender's Office had represented a State's witnesses [sic] during an unrelated matter a number of years prior to appellant's criminal proceeding.  In the context of an ineffective assistance of counsel claim based on an alleged conflict of interest, "[p]rejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland*, 466 U.S. at 692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350, 348 (1980)); *see also Clark v. State*, 108 Nev. 324, 326, 831 P.2d 1374, 1376 (1992).  Under the circumstances of

---

[4](...continued)

are even more conclusory – such as "counsel did not make any tactical decisions or strategic choices and misunderstood clear rules of law and petitioner's available options."  Such conclusory allegations unsupported by any specific facts do not present a viable claim for federal habeas relief. *E.g., James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).

1   this case, the fact that the Clark County Public Defender's Office
2   represented a State witness in a distant unrelated matter did not
    demonstrate that appellant's trial counsel actively represented
3   conflicting interests. Therefore, the district court did not err in
    denying this claim.

4   (ECF No. 12-32, at 4-5; Exhibit 82, at 3-4.)

5       The state appellate courts' rejection of this claim was neither contrary to nor an

6   objectively unreasonable application of clearly established federal law as determined by the

7   United States Supreme Court. Hollimon's lawyer, Erika Ballou, never personally represented

8   Dovie Henderson. Thus, in this context, the Sixth Amendment's right to conflict-free counsel

9   was violated only if the prior representation of Henderson by the office of the public defender

10  "adversely affect[ed] [her] performance." *Alberni v. McDaniel*, 458 F.3d 860, 870 (9th

11  Cir.2006). This conclusion follows because "'an actual conflict of interest means precisely a

12  conflict that affected counsel's performance — as opposed to a mere theoretical division of

13  loyalties.'" *Id.* (quoting *Mickens v. Taylor*, 535 U.S. 162, 171 (2002)(emphasis and alterations

14  omitted)).

15      Hollimon presented the state courts with no nonconclusory factual allegations specific

16  to his case establishing an actual conflict of interest by Ballou. Rather, he alleged that

17  counsel "failed to investigate and discover the witnesses were represented by the public

18  defenders office in criminal proceedings." (ECF No. 12-11, at 32; Exhibit 61, at 31.)[5] By

19  definition, counsel's performance in her representation of Hollimon could not have been

20  affected by a prior representation of a witness by the public defender of which she herself was

21  not aware. The state courts' rejection of this claim thus was not an objectively unreasonable

22  application of clearly established federal law on the allegations and record presented to the

23  state courts.

24      Ground 1(d) therefore does not provide a basis for federal habeas relief.

25

26  _____

27      [5]Petitioner alleges exactly the opposite in the federal petition, instead that "counsel knew that the
    Pubic Defender's Office had represented a State's witness." (ECF No. 6, at 13.) Over and above exhaustion
    considerations, this Court's review is limited to the record presented to the state courts. *Pinholster, supra.*
28  Hollimon presented no allegation in the state district court that Ballou was aware of the prior representation.

-14-

***Ground 2: Sufficiency of the Evidence***

In Ground 2, petitioner alleges that the evidence was insufficient to support his conviction for robbery because he did not intentionally or deliberately use force against any person and the State failed to prove that any force involved in taking the purse was intentional rather than incidental or accidental. (See No. 2:15-cv-02075-JCM-VCF, ECF No. 1-1, at 8-9.)[6]

The trial evidence is summarized previously herein. (See text, *supra*, at 1-4.)

The jury was instructed, *inter alia*, as follows:

> Robbery is the unlawful taking of personal property from the person of another, or in her presence, against her will, by means of force or violence or fear of injury, immediate or future, to her person or property, or the person or property of a member of her family, or of anyone in her company at the time of the robbery. Such force or fear must be used to obtain or retain possession of the property, to prevent or overcome resistance to the taking, or to facilitate escape, in either of which cases the degree of force is immaterial if used to compel acquiescence to the taking of or escaping with the property.
>
> . . . . .
>
> It is unnecessary to prove both violence and intimidation. If the fact be attended with circumstances of threatening word or gesture as in common experience and is likely to create an apprehension of danger and induce a man to part with his property for the safety of his person, it is robbery. It is not necessary to prove actual fear, as the law will presume it in such a case.

(ECF No. 11-8, at 10 & 13; Exhibit 33, Instruction Nos. 9 & 12.)

The Supreme Court of Nevada rejected the claim presented on direct appeal on the following grounds:

> First, appellant Reginald Hollimon contends that insufficient evidence supports his conviction. We disagree and conclude that the evidence, when viewed in the light most favorable to the State, is sufficient to establish guilt beyond a reasonable doubt as determined by a rational trier of fact. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Mitchell v. State*, 124 Nev. 807, 816, 192 P.3d 721, 727 (2008).

---

[6]See note 5, *supra*, regarding the location of a portion of the federal petition.

1

2

3

4

5

6

7

8

> At trial, several witnesses testified that a man, later identified as Hollimon, approached the victim and her daughter in a grocery store parking lot. After grabbing the victim's purse from her shopping cart, Hollimon began running, lowered his shoulder, and struck the victim's daughter with sufficient force to knock her to the ground. We conclude that the jury could reasonably infer from the evidence presented that Hollimon committed robbery. *See* NRS 200.380(1); *Grant v. State*, 117 Nev. 427, 435, 24 P.3d 761, 766 (2001)(the jury may infer intent "from conduct and circumstantial evidence"). It is for the jury to determine the weight and credibility to give conflicting testimony, *McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992), and its verdict will not be disturbed on appeal where, as here, sufficient evidence supports the verdict, *Bolden v. State*, 97 Nev. 71, 73, 624 P.2d 20, 20 (1981).

9    (ECF No. 12-4, at 2-3; Exhibit 54, at 1-2.)

10    The state supreme court's rejection of this claim was neither contrary to nor an

11   objectively unreasonable application of clearly established federal law as determined by the

12   United States Supreme Court. On a challenge to the sufficiency of the evidence, the habeas

13   petitioner faces a "considerable hurdle." *Davis v. Woodford*, 333 F.3d 982, 992 (9th Cir. 2003).

14   Under the standard announced in *Jackson v. Virginia*, 443 U.S. 307 (1979), the jury's verdict

15   must stand if, after viewing the evidence in the light most favorable to the prosecution, any

16   rational trier of fact could have found the essential elements of the offense beyond a

17   reasonable doubt. *E.g., Davis*, 333 F.3d at 992. Accordingly, the reviewing court, when faced

18   with a record of historical facts that supports conflicting inferences, must presume that the

19   trier of fact resolved any such conflicts in favor of the prosecution and defer to that resolution,

20   even if the resolution by the state court trier of fact of specific conflicts does not affirmatively

21   appear in the record. *Id.* The *Jackson* standard is applied with reference to the substantive

22   elements of the criminal offense as defined by state law. *E.g., Davis*, 333 F.3d at 992. When

23   the deferential standards of AEDPA and *Jackson* are applied together, the question for

24   decision on federal habeas review thus becomes one of whether the state supreme court's

25   decision unreasonably applied the *Jackson* standard to the evidence at trial. *See, e.g., Juan*

26   *H. v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005).

27    In the present case, the state supreme court reasonably applied the *Jackson* standard

28   to the evidence presented at trial. From the Court's independent review of the trial record,

summarized previously herein, there was sufficient evidence, viewed in the light most favorable to the prosecution, from which the jury could infer that Hollimon lowered his shoulder into and struck Onyx Thomas in an effort to intimidate both Jolene Thomas and Onyx Thomas, suppress any resistance, and make his getaway with the stolen purse.  The jury could infer from the circumstantial evidence that Hollimon's use of force was intentional rather than accidental.  (See text, *supra*, at 3 & n.3.)

Ground 2 does not provide a basis for federal habeas relief.

### *Ground 3: Voir Dire – Dismissal of Prospective Juror for Cause*

In Ground 3, petitioner alleges that "[t]he State of Nevada erred when it allowed the only African American in the jury pool to be removed for cause."  He alleges that "the state judges [sic] error affected [his] substantial rights because it prevented him from making the *Batson v. Kentucky* challenge . . . based on the State of Nevada's discriminatory questioning and illegitimate request to strike the only minority."  He thereafter seeks reversal for structural error, citing a Nevada state case.  (ECF No. 6, at 16.)

Early during voir dire, the trial judge asked a preliminary question as to whether jury service for the anticipated three-day trial would constitute an extreme or undue hardship for any of the venire members.  Juror No. 152 responded that she had school the same three days of the week and did not know if she could miss a week of school.  She indicated that she attended CSN, which is the abbreviation for the College of Southern Nevada, a community college in the Las Vegas metropolitan area.  The trial judge informed her that she could not be penalized for jury service and that the college would have to allow her to make up any missing course work.  (ECF No. 10-25, at 9 & 12-13; Exhibit 25, at 8 & 11-12.)

Subsequently, the court was conducting individual voir dire of the prospective jurors in open court with the entire venire present.  Juror No. 152 stated, *inter alia*, that she was in her first year at CSN as she had just graduated high school.  She was taking basic courses as she was not sure what she wanted to do yet.  She stated that she also worked as a manager at Charlotte Russe, which is a retail chain store selling young women's clothes.  (ECF No. 10-25, at 128 & 130; Exhibit 25, at 127 & 129.)

1       The voir dire of Juror No. 152 included the following exchange after she referred to

2   where she then was with her education:

3           THE COURT: Now, obviously you're young and you might
        be one of the – youngest person on the jury –

4
        PROSPECTIVE JUROR NO. 152: Yeah.

5
        THE COURT: – if you're selected to serve as a juror, even

6           though you're younger, you know, than all or most of the jurors,
        would you still be able to go in the back and stand your ground if

7           you have an opinion and you think the rest of the jury has got it
        wrong?

8
        PROSPECTIVE JUROR NO. 152: I'm going to have to say

9           no.

10          THE COURT: Okay.  Why not?

11          PROSPECTIVE JUROR NO. 152: I'm not sure like of
        everything yet.  Like when you guys were talking, I was totally

12          confused.

13          THE COURT: About what?

14          PROSPECTIVE JUROR NO. 152: Everything.  Like I'm
        going to be honest, everything.  But I'm not – I don't really watch

15          TV too much.  I don't –

16          THE COURT: Okay.  Well, that's okay.

17          PROSPECTIVE JUROR NO. 152: Like you know what I
        mean, like, I barely even know what this case is about.  I mean,

18          I'm kind of listening, but I'm still young so – I'm so –

19  (ECF No. 10-25, at 128-29; Exhibit 25, at 127-28.)

20      Later in the voir dire, the trial judge received the following responses when she inquired

21  as to whether the prospective juror was open-minded:

22          THE COURT: Do you think you're an open-minded kind of
        person?

23
        PROSPECTIVE JUROR NO. 152: No, not at all.

24
        THE COURT: You're not.  Okay.  And how so?

25
        PROSPECTIVE JUROR NO. 152: I'm really shy.  I have,

26          like, a disability kind of.  So I'm not really – I'm not going to say
        I'm dumb; I'm not going to say that.

27
        THE COURT: Okay.  Is it like a learning –

28

1    PROSPECTIVE JUROR NO. 152: Yes.

2    THE COURT: Okay.  Does is [sic] relate – like dyslexia or?

3    PROSPECTIVE JUROR NO. 152: I'm not sure what you
4    would call it.

5    THE COURT: And again, I don't mean to pry.  Is this
6    something that's been diagnosed or somethin [sic] you just sort
     of think maybe you have?
7
     PROSPECTIVE JUROR NO. 152: Well, I've been in
8    special ed all my life so obviously there's something wrong, but
     they've never said, like, exactly what was wrong.
9
     THE COURT:  Okay. So you mean through the school
10   district?

11   PROSPECTIVE JUROR NO. 152: Yeah.

12   THE COURT: Okay.  But obviously if you're at CSN you
     graduated, you got a high school diploma and all of those things,
13   correct?

14   PROSPECTIVE JUROR NO. 152: Yeah.

15   (ECF No. 10-25, at 132-33; Exhibit 25, at 131-32.)

16        During followup voir dire by the State, Juror No. 152, *inter alia*: (1) again stated that she

17   could not be open-minded "[b]ecause I, like, don't understand, like what you guys are really

18   talking about," because "[l]ike you guys are using really big words;" (2) stated that "[i]t's just

19   that, like, I'm not really good at talking, giving my opinion 'cause like it's hard to, like, translate

20   what I'm thinking, you know, to understand what I'm saying;" (3) responded affirmatively that

21   she did not think that there was enough evidence and that she was leaning toward thinking

22   that the defendant was not guilty; and (4) responded "no" when the prosecutor asked her to

23   be honest and state whether "you think you'll be able to do that, to not lean before you sit

24   down in that chair as a juror?"  (ECF No. 10-25, at 133-35; Exhibit No. 25, at 132-34.)

25        Following two bench conferences, the court ultimately excused Juror No. 152 for

26   cause, after the defense had passed for cause but the State still was considering its options.

27   The defense did not object to the court excusing Juror No. 152 for cause.  (ECF No. 10-25,

28   at 135-36; Exhibit No. 25, at 134-35.)

1    At the end of the day, after the jury had been picked and the jurors and prospective

2    jurors had left, the court had the following exchange with counsel for the record:

3            THE COURT: . . . .

4            Do you need to place anything on the record?

5            MS. BALLOU [defense counsel]: No, Your Honor, because I would do a Batson challenge, but it wasn't their

6    peremptory; it was a for-cause challenge.

7            THE COURT: All right. Well, she was the only apparent African-American person; however, you know, she said she

8    wouldn't participate in jury deliberations, and she was confused, and she didn't understand all the big words we were using and

9    what big words those were.

10           Initially, I didn't want to excuse her because frankly I felt like she was just trying to get out of jury service because if she's

11    a student at CSN and a manager at Charlotte Russe, I think her cognitive abilities would be sufficient to serve as a juror; however,

12    her responses to the questions indicated that she wasn't suitable to be a juror. So based on that, I excused her even though I felt

13    like she may have been exaggerating her disability. I have to accept that she was in special ed classes in high school and

14    throughout her education, but that doesn't mean that she can't serve as a juror. So that was my thinking.

15           Anything else the State feels they need to say?

16           MR. HAMNER: I mean, Your Honor, I think in particular for

17    the State, the fact that we made numerous efforts to try to see if she could be open-minded, and I think after repeated questioning

18    the witness or the potential juror stated that no, she couldn't and that she was particularly leaning towards the defense, and that

19    was of particular concern to the State.

20    (ECF No. 10-25, at 146-47; Exhibit 25, at 145-46.)[7]

21    The state supreme court held as follows regarding the claim presented to that court on

22    direct appeal:

23           Second, Hollimon contends that the district court abused its discretion during voir dire by dismissing juror no. 152 for

24    cause. The district court noted that it dismissed juror no. 152 because she expressed confusion about the nature of the

25    proceedings and stated that she would have difficulty during deliberations as a result of a disability, which required her to take

26

27

[7]See also ECF No. 10-25, at 43-47; Exhibit 25, at 42-46 (discussing the racial composition of the

28    venire).

special education classes throughout school. Although Hollimon indicated that he would have raised a *Batson v. Kentucky*, 476 U.S. 79(1986), challenge had the State exercised a peremptory challenge to strike the juror, he declined to object to the district court's dismissal of juror no. 152 for cause. We therefore review Hollimon's contention for plain error, see *Leonard v. State*, 117 Nev. 53, 67, 17 P.3d 397, 406 (2001) (due to the fact-intensive nature of for-cause challenges and the deference owed the district court, timely objections are essential), and conclude that he fails to demonstrate that the district court plainly erred, see NRS 175.036(1) (the court may remove a juror "for any cause or favor which would prevent the juror from adjudicating the facts fairly").[FN1]

> [FN1]   Because juror no, 152 was removed for cause, we need not consider Hollimon's claims regarding *Batson* and *Miller–El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005).

(ECF No. 12-4, at 3; Exhibit 54, at 2.)

The state supreme court's rejection of this claim was neither contrary to nor an objectively unreasonable application of clearly established federal law as determined by the United States Supreme Court.  At the outset, Ground 3, as alleged, in part does not present a federal constitutional claim.  A claim that the trial judge abused her discretion under Nevada state statutory and jurisprudential standards is a claim of state law error that is not cognizable on federal habeas review.  The state supreme court's determination further that no viable *Batson* issue was presented because the prospective juror was excused for cause was neither contrary to nor an objectively unreasonable application of clearly established federal law.  The Supreme Court has never held that the *Batson* doctrine applies to a trial court's decision to excuse a prospective juror for cause.  *See, e.g.*, *United States v. Blackman*, 66 F.3d 1572, 1575 n.3 (11th Cir. 1995)("no authority suggests *Batson* extends to the area of challenges for cause"); *United States v. Bergodere*, 40 F.3d 512, 515-16 (1st Cir. 1994)(the defendant must show that the challenge was peremptory rather than for cause); *see also Hernandez v. New York*, 500 U.S. 352, 362-63 (1991)("While the reason offered by the prosecutor for a peremptory strike need not rise to the level of a challenge for cause . . . , the fact that it corresponds to a valid for-cause challenge will demonstrate its race-neutral character.").  Absent such authority by the United States Supreme Court, the state supreme

-21-

court was not required by clearly established federal law to apply *Batson* to such a trial court decision. *See, e.g., Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)("it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court"). Petitioner otherwise cites no apposite Supreme Court authority establishing at the time of the state supreme court's decision that excusing a prospective juror for cause in the circumstances presented violated federal constitutional law.

Ground 3 therefore does not provide a basis for federal habeas relief.

### Ground 4: Alleged Prosecutorial Misconduct

In Ground 4, petitioner alleges that he was denied due process of law in violation of the Fifth and Fourteenth Amendments due to prosecutorial misconduct when the prosecution: (1) asked improper leading questions to get the victims to testify untruthfully and speculate as to his intentions; (2) elicited lay opinion testimony about his intentions after the trial court sustained objections to such testimony; and (3) misstated key evidence by claiming that the victim specifically had stated that petitioner deliberately and intentionally bumped her, which petitioner maintains is a lie. Relying upon *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), petitioner contends that the prosecution's actions so infected the trial with unfairness as to make the resulting conviction a denial of due process.

The Supreme Court of Nevada held as follows on direct appeal:

> Third, Hollimon contends that the State committed misconduct by asking leading questions of the witnesses during direct examination and the district court erred by not intervening despite Hollimon's failure to object. Although some of the challenged questions were leading, we conclude that Hollimon is not entitled to relief because the improper questioning did not implicate Hollimon's constitutional rights and did not constitute misconduct which rises to the level of plain error, *see Valdez v. State*, 124 Nev. 1172, 1190, 196 P.3d 465, 477 (2008) (failure to object to prosecutorial misconduct warrants plain error review), or require the district court's intervention *sua sponte*, *see Leonard*, 117 Nev. at 70, 17 P.3d at 408 (the improper use of leading questions is not ordinarily a ground for relief).
>
> Fourth, Hollimon contends that the State committed misconduct by flagrantly disregarding the district court's admonishment not to elicit speculative testimony. Hollimon lodged

-22-

several objections when the State asked witnesses whether they believed Hollimon intended to strike the victim's daughter, some of which were sustained. When the State repeated the question while questioning the victim's sister, Hollimon renewed his objection. The district court noted that it was appropriate for the witness to state her perception of the incident but not to speculate regarding Hollimon's intent and permitted the witness to answer. We conclude that the State did not commit misconduct.

Fifth, Hollimon contends that the State committed misconduct by misstating the testimony of witnesses during direct examination, closing argument, and rebuttal. We conclude that Hollimon is not entitled to relief because he did not object and fails to demonstrate plain error – specifically because the jurors were instructed to rely on their own recollection and that the statements of counsel were not evidence. *See Leonard*, 117 Nev. at 66, 17 P.3d at 405 (presuming that jurors follow the instructions they are given).

(ECF No. 12-4, at 4-5; Exhibit 54, at 3-4.)

The state supreme court's rejection of this tripartite ground was neither contrary to nor an objectively unreasonable application of clearly established federal law.

On this ground, it is critical to distinguish state and federal criminal law standards for prosecutorial conduct from the federal constitutional standard. On federal habeas review of a state court conviction for constitutional error, the standard of review for a claim of prosecutorial misconduct, is "'the narrow one of due process, and not the broad exercise of supervisory power'" applied in federal criminal trials. *See, e.g., Darden*, 477 U.S. 168 at 181 (*quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). Nor do alleged violations of state law standards for prosecutorial conduct present cognizable federal claims. Rather, under the narrower due process standard, "[t]he relevant question is whether the [alleged misconduct] 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden, supra* (*quoting Donnelly*, 416 U.S. at 643). *Accord Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir. 1995).

In this regard, in assessing whether a state court's express or implicit rejection of a claim under this general due process standard was objectively unreasonable:

. . . . The meaning of "unreasonable" can depend in part on the specificity of the relevant legal rule. If a rule is specific, the

-23-

> range of reasonable judgment may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over time. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.

*Yarborough v. Alvarado*, 541 U.S. 652, (2004).

In the present case, the state supreme court's implicit rejection of petitioner's due process claim was not an objectively unreasonable application of the above general due process standard. The Court has independently reviewed the specific questions and argument challenged in Hollimon's direct appeal briefing,[8] within the context of the overall trial evidence summarized herein.[9] Following such review, it was not objectively unreasonable for the state supreme court to conclude that the State's occasional leading questions, manner of eliciting testimony regarding intent, and/or representations in argument did not so infect petitioner's trial with unfairness as to make his conviction a denial of due process.

Ground 4 accordingly does not provide a basis for federal habeas relief.

IT THEREFORE IS ORDERED that the petition for a writ of habeas corpus is DENIED on the merits and that this action shall be DISMISSED with prejudice.

IT FURTHER IS ORDERED that a certificate of appealability is DENIED, as jurists of reason would not find the Court's disposition of the claims presented to be debatable or incorrect, for the reasons discussed herein.

The Clerk of Court shall enter final judgment accordingly, in favor of respondents and against petitioner, dismissing this action with prejudice.

DATED: April 18, 2018

_____
Gloria M. Navarro
Chief United States District Judge

---

[8] See ECF No. 12-1, at 19-27; Exhibit 51, at 18-26.

[9] See text, *supra*, at 1-4.

-24-